26 C.C.P.A. (Patents)

### GRAY v. JENKINS.
### Patent Appeal No. 3997.

Court of Customs and Patent Appeals.
Jan. 23, 1939.

Benjamin B. Schneider, of Chicago, Ill., and Edward B. Beale, of Washington, D. C., for appellant.

Parkinson & Lane, of Chicago, Ill. (Howard A. Hartman, of Milwaukee, Wis., Frederick Mason, of Chicago, Ill., Frederick Schafer, of Washington, D. C., and Wallace R. Lane, of Chicago, Ill., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to appellee.

The interference is between appellant's application, serial No. 120,272, filed July 3, 1926, and appellee's application, serial No. 723,144, filed June 30, 1924.

Appellant is the junior party, and the burden was upon him to establish priority of invention by a preponderance of the evidence.

The involved invention, which relates to the use of non-aqueous lime in oil cracking processes, is sufficiently described in the appealed counts. They read:

"8. The process of converting higher boiling hydrocarbon oils into lower boiling hydrocarbon oils which comprises *heating a flowing stream of liquid oil to raise it to a cracking temperature, passing the heated oil into a converting vessel* under superatmospheric pressure, maintaining the oil in the vessel at a temperature suitable to active decomposition, leading away the evolved vapors, introducing a predetermined quantity of substantially nonaqueous lime *into the fresh oil stream, before it attains a cracking temperature,* and withdrawing during the process residual material and lime from the bottom of the converting vessel to prevent the accumulation of lime in the vessel." (Italics ours.)

"9. The process of converting higher boiling hydrocarbon oils into lower boiling hydrocarbon oils which comprises *heating a flowing stream of the liquid oil to raise it to a cracking temperature, passing the heated oil into a converting vessel* under superatmospheric pressure, maintaining the oil in the vessel at a temperature suitable to active decomposition, leading away the evolved vapors, and *continuously* introducing a predetermined quantity of substantially nonaqueous lime *into the fresh oil stream before it attains a cracking temperature.*" (Italics ours.)

"10. In the process of converting higher boiling hydrocarbon oils into lower boiling hydrocarbon oils characterized by *heating a flowing stream of the oil to a cracking temperature, passing the hot oil into a converting vessel in which a substantial body of liquid oil is maintained,* continuously effecting decomposition of the oil in the vessel under superatmospheric pressure, the step of maintaining a predetermined and substantially constant quantity of substantially nonaqueous lime in the oil subjected to decomposition temperature." (Italics ours.)

Considerable evidence was introduced by the parties.

It is contended by counsel for appellant that the evidence establishes that appellant conceived the invention and disclosed it to others on or about April 7, 1924; that he was continuously active thereafter until he successfully reduced the invention to practice sometime between the first of June and the last of September 1925; that appellee is not entitled to a date for conception of the invention prior to May 27, 1924; and that, therefore, appellant is entitled to an award of priority.

The Examiner of Interferences held that appellant had failed to establish conception of the invention prior to September 2, 1924; that appellee was entitled to a date as early as May 27, 1924 for conception; and that, as appellee was entitled to the filing date of his application, June 30, 1924, for constructive reduction to practice, he was entitled to an award of priority.

The Board of Appeals affirmed the decision of the Examiner of Interferences, although, in so doing, it expressed the view that appellee was probably entitled to a date in 1923, the precise month not being stated, for conception of the invention.

It appears from the record that in 1924 appellant was assistant manager in charge of research of the oil refining department of the Texas Company, producer and refiner of oil; that his office was located in New York City; and that, on April 7, 1924, he wrote a letter (appellant's Exhibit No. 2) to F. W. Hall, who on that date was chief chemist at the Port Arthur Works of the Texas Company, Port Arthur, Texas.

The pertinent part of Exhibit No. 2 reads:

"You have been doing considerable work in testing out a number of distillates from different crudes as to the value of each one for cracking purposes.

"I wish you would take a certain amount of distillate and run same through your experimental cracking unit to determine the yield obtained and the tests of the distillate and the residual oil, then take a sample of the same Pressure Gas Oil and use in connection with this oil 2% of magnesium oxide, operate the still under the same pressures and temperatures and test the distillates.

"After the use of the magnesium oxide also make a run using 2% of calcium oxide and make tests of the products. Hold the temperatures and pressures exactly the same in all cases.

"I wish you would see whether the distillate is freer from hydrogen sulphide in one case than in the other and also whether the gasoline produced is better where the oxide is used in connection with it than where none is used.

"If possible the oxide should be introduced with the charge if you are feeding the charge into the apparatus continuously."

Upon receipt of the letter, Hall made the following notation thereon: "Watson: Pl. make tests requested. H."

Watson, who was director of research of distillation and cracking of oils for the Texas Company at the Port Arthur Works, designated two of his subordinates, the witness Stapleton and one Johnston, who did not testify, to make the tests suggested in the letter.

The experimental cracking unit, referred to in appellant's letter (Exhibit No. 2), was described by the witness Stapleton in the following language: "It was a unit set up by the research laboratory at the Port Arthur Works in a manner duplicating Holmes-Manley Vertical Still operation, and consisted of measuring tanks from which *charge to be processed was pumped to or around a preheater coil into the still,* a still approximately eight inches in diameter and four feet long. *Bottoms were drawn from this still to maintain a constant level.* Vapor from the still passed from the top of the still into the base of a fractionating tower, which was approximately four inches in diameter and six feet long and packed with Lessing rings. This tower was equipped with a closed coil in the top, through which oil was circulated to supply cooling to the tower to effect fractionation of the vapor entering the tower from the still." (Italics ours.)

It appears from the record that appellant's experiments were carried out under the direct supervision of the witness Stapleton, who testified that, although he originally considered using the preheater, he decided not to do so, and that the preheater was not used to heat the oil to a cracking temperature before it was passed into the converting vessel or still in any of the experiments or "runs" made prior to June 1925, long after appellee had filed his application—June 30, 1924. Instead of using the preheater in the "runs" made on behalf of appellant in 1924, the oil was heated to

a cracking temperature in the still itself. Furthermore, in a report, dated May 26, 1924 (appellant's Exhibit No. 41), a copy of which was sent to appellant, it clearly appears that the experts who performed the experiments in response to appellant's letter of April 7, 1924 (appellant's Exhibit No. 2) thought they were complying fully with appellant's request, although, the preheater was not used and the oil was not heated to a cracking temperature before it passed into the still.

The first paragraph of the report (appellant's Exhibit No. 41) reads as follows:

"Estimate 2000.
"Port Arthur Works    Experiment No. 26.
"Research Laboratory    May 26, 1924.

"Introduction.

"All but.one of the series of runs *called for by Dr. Gray in his letter* on "Evaluation of Crudes" dated April 7, 1924, *have been made.* The *runs charging 2% calcium oxide* with the Pressure Gas Oil, and the runs charging the Gas Oil alone have been made. The runs charging magnesium oxide will be made in a few days and a detailed report will follow their completion. As outlined by Dr. Gray considerable care was taken to keep the temperatures and pressures exactly the same for all of these runs. The pressure used was 150 pounds, the still temperature 780°F., and the overhead vapor temperature 400°F." (Italics ours.)

Although appellant testified that, at the time he wrote the letter of April 7, 1924 (appellant's Exhibit No. 2), he had in mind that the oil would be heated to a cracking temperature by the preheater before it passed into the still or converting vessel, he must have known, as early as May 1924, from the reports made by those carrying out the experiments on his behalf that the oil in which lime was introduced was not being preheated. Furthermore, there is nothing in the record to indicate that, prior to August 28, 1924, either appellant or any of the Texas Company's experts thought their experiments would have been more satisfactory had the oil containing lime been heated to a cracking temperature before it was passed into the still.

On August 28, 1924, approximately three months after appellee filed his involved application, appellant wrote a letter (appellant's Exhibit No. 87) addressed to F. T. Manley, Houston, ·Texas, who, at that time, was manager of the refining department of the Texas Company, in which, after stating that he had had Mr. Hall make some experiments wherein 2% of lime was used *"in the still"* (italics ours) during the experimental cracking, and after stating generally the results of those experiments, he said:

"Do you think it would be a good idea to have an experiment made on one of the high pressure batteries by *feeding a certain amount of air-slacked lime in with the pressure gas oil and passing same through the preheater so that the lime would go into the pressure stills?* By so doing we might be able to cause the sulphur compounds to combine with the lime or other alkali and thus prevent the action of the sulphur on the sides' of the stills and in the bubble towers. I believe it would result in a great deal less deposit of sulphide of iron in the bubble trays and thus avoid the necessity of having them cleaned as often as we do. The presence of the lime sulphide might have a tendency to keep the sides of the pressure stills cleaner and also, we would have a certain amount of lime sulphide deposit on the stirring mechanism which could be cleaned off very easily, as it is soluble in water.

"*It might ·not be possible, however, to pump the lime mixed with the pressure gas oil through the preheaters, due to the fact that the lime might be deposited and baked on the tubes.* If such be the case, then it might be possible to pump this lime in the gas oil after it passes through the preheater and ·before it enters No. 1 still. *I think this is an experiment that should be made.*" (Italics ours.)

That letter was received by the witness Manley on September 2, 1924, and appellant was given that date by the Examiner of Interferences for conception of the involved invention.

Each of the involved counts requires that a flowing stream of oil be heated to a cracking temperature before it is passed into the converting vessel. In addition, count 8· requires "introducing a predetermined quantity of substantially nonaqueous lime into the fresh oil stream, before it attains a cracking temperature"; count 9 requires that the non-aqueous lime shall be *continuously* introduced into the fresh oil stream before it attains a cracking temperature; and count 10 requires "maintaining a predetermined and substantially constant quantity of substantially non-aqueous lime in

the oil subjected to decomposition temperature."

The tribunals of the Patent Office concurred in holding that appellant's letter of April 7, 1924 (appellant's Exhibit No. 2) did not disclose the invention defined by the appealed counts, and, therefore, refused to award appellant that date for conception of the invention. With regard to that exhibit, the Examiner of Interferences stated, in part, as follows: "The letter, Gray's Exhibit 2, itself does not express a complete conception of the invention recited in the counts as will be noted shortly, but it was addressed to those skilled in the art and acquainted with Dr. Gray, and it thus may have meant more as a disclosure than appears on its face. On its face it merely mentions the making of comparative runs in an experimental cracking unit using and not using predetermined amounts of oxides, among which was non-aqueous lime (2% calcium oxide), and using the same pressures and temperatures. It also mentions that the oxide should be fed with the charge if the charge were fed continuously. No preference, however, is voiced as to the continuity of the feed, nothing is stated equivalent to preheating the charge in a flowing stream to raise it to a cracking temperature as required in effect by all three counts and much that is possibly conveyed in it in regard to still structure and procedure, mentioned in the counts, is comprised in the words 'your experimental cracking unit.'"

It will be observed that appellant did not state in Exhibit No. 2 that a flowing stream of oil should be heated to a cracking temperature before it was passed into the converting vessel, nor is there any suggestion of the desirability of such a step, unless the last paragraph of the exhibit contains such a suggestion. It reads: "If possible the oxide should be introduced with the charge if you are feeding the charge into the apparatus continuously." That language clearly suggests the desirability of introducing the lime into the charge (the oil) before it attained a cracking temperature, if the "charge" was being fed "into the apparatus continuously." What meaning that language conveyed to those skilled in the art to whom it was addressed, is the question first to be determined. It will be recalled that the witness Stapleton stated that the experimental apparatus consisted, among other things, of a "preheater coil," frequently referred to in the record as a "preheater," and a still or converting vessel, and that the charge could be "pumped to or around" the "preheater coil into the still." The function of the preheater was to heat the charge before it passed into the still. Accordingly, the question is presented, could the charge be fed into the apparatus continuously without heating it to a cracking temperature in the preheater before it was passed into the still? If it could, it is obvious that the exhibit does not suggest heating the charge to a cracking temperature before passing it into the still or converting vessel, as required by the counts.

The Examiner of Interferences was of opinion that the oil could be fed into the apparatus continuously without preheating it to a cracking temperature before it was passed into the converting vessel. In this connection, he said: "Also in the last paragraph of Gray's Exhibit 2 the contingency is noted that the charge might not be fed to the apparatus continuously. Lack of continuous feed through a preheating coil due to danger of coking would render it hard to secure reliable results and to make comparative runs which latter was what Dr. Gray desired * * *. It is considered that had Dr. Gray had in mind definitely to preheat the charge in a flowing stream to a cracking temperature he would have given more positive directions instead of expressing what amounts to an anticipation of non-use of a preheater * * *. Of course, the said last paragraph also infers that the feed might be continuous, *but this could take place without preheating the oil to a cracking temperature.* In this connection it may be noted that the blueprint, Gray's Exhibit 7, if the alterations added during the taking of testimony be disregarded, *shows the laboratory unit arranged for continuous operation and hence continuous charging, without the use of a preheater to raise the oil to a cracking temperature.* This blueprint bears the date, March 18, 1924, which was a scant three weeks before Dr. Gray wrote the letter, Gray's Exhibit 2, and it may have represented the extent of his knowledge at the time as to the laboratory apparatus structure * * *." (Italics ours.)

It clearly appears from appellant's Exhibit No. 7 (referred to in the decision of the Examiner of Interferences) that the experimental cracking unit was so arranged that, without using the preheater to heat the charge, the charge could be fed continu-

ously into the still. Furthermore, it appears from the testimony of the witness Stapleton that, during the spring and summer of 1924, the experimental apparatus was so arranged that the charge could be, and, in fact, was, fed continuously into the still without using the preheater to heat it. Accordingly, the statement in appellant's Exhibit No. 2, that the lime should, if possible, "be introduced with the charge" if the "charge" was being fed "into the apparatus continuously," may have been, and so far as we are able to ascertain from the record was, written by appellant with the understanding on his part that the charge could be fed into the experimental cracking unit continuously without preheating it to a cracking temperature before it was passed into the still. Such an interpretation of the language in the last paragraph of appellant's Exhibit No. 2 is entirely consistent with the activities of appellant's experts, who apparently believed that they were complying fully with appellant's requests in performing the experiments without heating the oil to a cracking temperature (in the preheater) before it was introduced into the "still."

Much stress is laid, by counsel for appellant on the fact that the preheater in the Texas Company's experimental cracking unit was not satisfactory when the experiments were performed in the spring and summer of 1924. It is urged by counsel that efforts were being made to secure a satisfactory preheater in order to carry out the suggestions made by appellant in his letter of April 7, 1924 (appellant's Exhibit No. 2), and that a satisfactory preheater was not developed until September or October 1924. The difficulty with that argument is that it is not supported by the evidence. It clearly appears from the record that appellant's witnesses were attempting to secure a satisfactory preheater prior to the date of appellant's Exhibit No. 2, and that they continued their efforts until a satisfactory preheater was secured in September 1924; nevertheless, it was not until June 1925 that an experiment was performed by appellant's experts wherein lime was introduced into the charge, and the charge heated to a cracking temperature in the preheater before it was passed into the converting vessel. Furthermore, it appears from the testimony of appellant's witness Watson that one of the reasons the Texas Company made efforts to secure a satisfactory preheater was to avoid the necessity of applying directly to the wall of the still the high degree of heat necessary to raise the oil to a cracking temperature. The witness also testified that the laboratory results, so far as "quality and yield of the products" were concerned, were the same "when using and when not using the preheater." We quote from his testimony:

"Q. 36. You also spoke before of difficulties in heating the still. What were these difficulties? A. We had one case that I recall quite vividly, when the still ruptured on account of the heat being of too high a temperature. We observed the still to be quite red during the operation, and when the still was dismantled after the run we noticed there had been excessive scaling of the still wall.

"Q. 37. And were you doing anything to avoid these difficulties? A. We were attacking the problem from two standpoints. One of them was to design an internal heater so that the still wall resisting the pressure would not be subjected to the severe conditions. Furthermore, we were working on the design of a preheater so that less heat would be circulated in the still proper."

"RDQ. 482. And with regard to the occasional use or non-use of the preheater in the experimental unit with relation to the use of the preheater in the Holmes-Manley Vertical Stills? A. The results in the Laboratory, from the standpoint of quality and yield of the products, were the same when using and when not using the preheater. Consequently, efforts were made to develop a preheater to obviate difficulties inherent to the addition of all the heat to the wall of the still in the Laboratory. Furthermore, in either case, when using the preheater or not using the preheater, Laboratory results were approximately the same as the plant results, from the standpoint of yield and quality of products."

"RXQ. 511. And I believe you testified in your redirect examination, Mr. Watson, that in the experimental still it made no difference whether the preheater was used or not, didn't you? A. Yes sir, the result from the standpoint of yield and quality is about the same."

It is evident, we think, that the efforts to develop a satisfactory preheater were not made for the purpose of carrying out any suggestion which appellant's experts thought had been made in appellant's letter of April 7, 1924 (appellant's Exhibit No. 2).

We are of opinion that appellant has failed to establish conception of the inven-

tion in issue prior to September 2, 1924, when his Exhibit No. 87 was received by the witness F. T. Manley to whom it was addressed. As that date is subsequent to the filing date of appellee (June 30, 1924), it is unnecessary for us to discuss the evidence introduced by appellee relative to his activities prior to his filing date.

Subsequent to the filing of the record in this court, appellee filed a motion suggesting a diminution of the record by adding thereto the following documents:

1. Motion to dissolve on behalf of George W. Gray, filed on or about February 16, 1931.

2. Supplemental motion to dissolve on behalf of George W. Gray, filed on or about May 29, 1931.

3. And any official papers accompanying above items 1 and 2.

4. Twenty-five (25) printed copies of United States patent to Ulysses S. Jenkins, No. 1,226,526, granted May 15, 1917.

The motion was granted, subject, however, to the order of the court that the costs of printing the additional matter requested by appellee should be taxed on final decision.

We are of opinion that the additional matter so certified to the court was unnecessary to a proper determination of the issues in the case. Accordingly, the costs of printing the same will be taxed against appellee.

The decision of the Board of Appeals is affirmed.

Affirmed.